1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

PAUL ANTHONY LOPEZ,

               Petitioner,

   v.

K. HARRINGTON, Warden,

               Respondent.

_____/

1:10-cv-00925 GSA HC

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT FOR RESPONDENT

ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY

     Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The parties have voluntarily consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

## RELEVANT HISTORY[1]

     Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation following his conviction in Stanislaus County Superior Court in 2007 of attempted murder (Cal. Penal Code §§ 187/664), possession of a shank while in jail (Cal. Penal Code § 4502(a)), and participation in a criminal street gang (Cal. Penal Code § 186.22(b)(1)). Allegations that Petitioner had personally used a deadly weapon and inflicted great bodily injury

---

[1] This information is taken from the state court documents attached to Respondent's answer and are not subject to dispute.

1

1  were found true.  On December 21, 2007, Petitioner was sentenced to serve an indeterminate

2  term of fifteen years to life plus two years.

3      Petitioner filed a timely notice of appeal.  On June 24, 2009, the California Court of

4  Appeal, Fifth Appellate District (hereinafter "Fifth DCA"), affirmed Petitioner's judgment.  He

5  petitioned for rehearing, and the Fifth DCA denied the petition.  On July 28, 2009, Petitioner

6  filed a petition for review in the California Supreme Court.  The petition was summarily denied

7  on October 14, 2009.

8      On May 24, 2010, Petitioner filed the instant federal habeas petition.  He presents the

9  following three (3) claims for relief: 1) The trial court abused its discretion in violation of

10 Petitioner's due process rights when it admitted unauthenticated evidence; 2) The trial court

11 violated Petitioner's due process rights under the Confrontation Clause to the Sixth Amendment

12 to the Constitution when it admitted a redacted confession by a co-defendant; and 3) The

13 conviction was obtained due to the prosecution's failure to disclose favorable evidence and due

14 to the coaching of a key prosecution witness.  On August 11, 2010, Respondent filed an answer

15 to the petition.  Petitioner did not file a traverse.

16              **STATEMENT OF FACTS**[2]

17     All three defendants were inmates at Stanislaus County Jail and all were validated
   members of the Norteño gang. Lindsay, McKenzie, and the three defendants were housed
18 together with other documented members of the Norteño gang [FN2] in a 12-man cell. On
   October 19, 2006, the inmates were removed from their cell for cell maintenance. Four of
19 the inmates, including Lindsay, temporarily were placed together in a holding cell. While
   in the cell, Lindsay found three balloons of heroin. Lindsay gave one balloon to a
20 cellmate and secreted two of the balloons on his person. Later, Lindsay informed A.
   Lopez and P. Lopez about the heroin. Heroin is a valuable commodity in jail. Generally,
21 gang members are required to share with other gang members any drugs that are found,
   not for consumption, but for use in gaining power and control within the jail. Lindsay
22 kept his two balloons instead of passing them on to gang leaders. He began to barter the
   heroin for commodity items, which violates the gang's code of conduct. Inmates who
23 engage in this behavior face punishment and "removal" by other gang members. Fatal
   removals involve the use of weapons.

24

25     FN2. The defendants are referred to in the record both by their names and by their
   gang monikers. P. Lopez is sometimes referred to as "Mugsy." A. Lopez is
26 sometimes referred to as "Soldier," and Lucero is sometimes referred to as "Lil
   Man" or "Manos." McKenzie's moniker is "Scorpizi" or "Scorpion" and Lindsay's

27

28     [2]The Fifth DCA's summary of the facts in its June 24, 2009, opinion is presumed correct. 28 U.S.C.
   §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the Fifth DCA.

moniker is "Psycho" or "Psychs."

Later that evening, after Lindsay took his shower, he was invited to join in a game of cards. Seated at the table were the three defendants and McKenzie. While sitting at the table, Lindsay was hit from behind in the chest. He turned and saw A. Lopez. P. Lopez came to Lindsay's side. At first, Lindsay believed P. Lopez was coming to his aid, but instead P. Lopez punched Lindsay in the face and was grinning. Lindsay was hit from the other side but was not sure who hit him. He tried to grab hold of McKenzie but was unable to stay up. Lindsay fell to the floor. His assailants then kicked and hit him numerous times. Lindsay yelled "man down" in an attempt to summon deputies. P. Lopez told him to "shut up" and "close [his] eyes," a reference Lindsay understood as meaning to die. Lucero kicked him from behind. Lindsay could not say how many times he was kicked or hit or who inflicted what blows. He did not see McKenzie hit or kick him. Lindsay did not see any weapons. After A. Lopez hit him in the chest, Lindsay pushed A. Lopez off of him and A. Lopez scooted to the right and was gone.

Lindsay lost consciousness. As a result of the attack, Lindsay suffered wounds to the back of his head requiring stitches; a number of scratches, including one across his neck; a slice and scrape across his nipple; and a small puncture-like wound on his chest that did not require stitches. There was no mention of the puncture wound or stabbing in the medical reports.

When the deputies arrived at the cell, Lindsay was down and nonresponsive. There was blood on the floor and blood scattered about the cell. None of the inmates in the cell claimed to have seen what happened. The deputies segregated the inmates who had visible signs of trauma. P. Lopez, A. Lopez, and one other inmate were found to have redness, swelling, or cuts on their hands. A. Lopez was wearing a T-shirt that had a sleeve torn off, and blood was found on his boxer shorts. P. Lopez's boxers also had blood on them. There were no marks found on Lucero's hands. After the assault, the heroin was gone.

The next morning, Deputy Teso, a gang specialist officer, came to investigate the attack. When interviewing an inmate, Teso asked him to lift his trouser legs. When the inmate complied, Teso found a "huila" or written memo. The huila was addressed to "Manos" and signed by "Soldier." It detailed the assault on Lindsay and named those who participated in the attack and provided the motive for the attack-Lindsay's failure to follow the gang's code of conduct.

Detective Navarro interviewed Lindsay the day after the assault. Lindsay did not identify any of his attackers. Later, Lindsay said he did not do so out of fear. In March 2007, Lindsay ran into A. Lopez during a court date. A. Lopez asked Lindsay if he was going to testify and told Lindsay he was lucky to be alive. Lindsay took this as a threat. After this encounter, Lindsay negotiated a deal with the prosecution and identified his attackers.

(See Resp't's Lodged Doc. 1.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

1   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

2   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

3   violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

4   out of the Stanislaus County Superior Court, which is located within the jurisdiction of this

5   Court.  28 U.S.C. § 2254(a); 2241(d).

6          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

7   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

8   enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; <u>Jeffries v. Wood</u>, 114

9   F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

10  <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

11  1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059

12  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

13  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

14  II.    <u>Standard of Review</u>

15         The instant petition is reviewed under the provisions of the Antiterrorism and Effective

16  Death Penalty Act which became effective on April 24, 1996.  <u>Lockyer v. Andrade</u>,  538 U.S.

17  63, 70 (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state

18  court's adjudication of his claim:

19         (1) resulted in a decision that was contrary to, or involved an unreasonable
           application of, clearly established Federal law, as determined by the Supreme
20         Court of the United States; or

21         (2) resulted in a decision that was based on an unreasonable determination of the
           facts in light of the evidence presented in the State court proceeding.
22
23  28 U.S.C. § 2254(d); <u>Lockyer</u>, 538 U.S. at 70-71; <u>Williams</u>, 529 U.S. at 413.

24         As a threshold matter, this Court must "first decide what constitutes 'clearly established

25  Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71,

26  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

27  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

28  of the time of the relevant state-court decision." <u>Id.</u>, *quoting* <u>Williams</u>, 592 U.S. at 412. "In other

4

1    words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

2    principles set forth by the Supreme Court at the time the state court renders its decision." Id.

3        Finally, this Court must consider whether the state court's decision was "contrary to, or

4    involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

5    72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

6    grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

7    Court on a question of law or if the state court decides a case differently than [the] Court has on a

8    set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

9    at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

10   state court identifies the correct governing legal principle from [the] Court's decisions but

11   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

12       "[A] federal court may not issue the writ simply because the court concludes in its

13   independent judgment that the relevant state court decision applied clearly established federal

14   law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

15   A federal habeas court making the "unreasonable application" inquiry should ask whether the

16   state court's application of clearly established federal law was "objectively unreasonable." Id. at

17   409.

18        Petitioner has the burden of establishing that the decision of the state court is contrary to

19   or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

20   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

21   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

22   state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-

23   01 (9th Cir.1999).

24       AEDPA requires that we give considerable deference to state court decisions. "Factual

25   determinations by state courts are presumed correct absent clear and convincing evidence to the

26   contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

27   factual determination will not be overturned on factual grounds unless objectively unreasonable

28   in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v.

1  Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to

2  findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett,

3  393 F.3d 943, 976-77 (2004).

4  III.    Review of Claims

5         A.   Admission of "huila" in Violation of Due Process

6         Petitioner first alleges the trial court erred in admitting unauthenticated evidence in the

7  form of a prison note known as a "huila" in violation of his due process rights.  Respondent

8  contends Petitioner is incorrect and the state court reasonably rejected the claim.

9         Petitioner presented this claim on direct appeal to the Fifth DCA and California Supreme

10  Court.  Because the California Supreme Court's opinion is summary in nature, this Court "looks

11  through" that decision and presumes it adopted the reasoning of the California Court of Appeal,

12  the last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797,

13  804-05 & n. 3 (1991) (establishing, on habeas review, "look through" presumption that higher

14  court agrees with lower court's reasoning where former affirms latter without discussion); see

15  also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to

16  last reasoned state court opinion in determining whether state court's rejection of petitioner's

17  claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

18         In denying Petitioner's claim, the appellate court stated as follows:

19     *I. Admission of the "huila"*

20         The defendants raise a number of issues related to the admission of the huila
    found the day after the assault. It was written to "Manos" and signed by "Soldier."
21    Deputy Teso testified that "Manos" referred to Lucero, who was also known as "Lil
    Man," and that A. Lopez was "Soldier." Navarro testified that Lucero was known by two
22    monikers, "Lil Man" and "Manos." Lindsay said that A. Lopez was the gang member
    referred to as "Soldier." The huila documented that the attempted "removal" of Lindsay
23    occurred on October 19, 2006. It explained that the removal was for "degenerate acts, use
    of drugs, heroin, promoting it, and spreading negativity amongst our people." It also
24    charged Lindsay with numerous prior violations of the gang code. The author noted that
    he had "assisted" in the removal, and that he had arrived at the jail on "Thursday, 10-12-
25    06, from DVI, Tracy." After explaining the details of the acts leading to the removal, the
    author stated, "I was the hitter. After I hit [Lindsay] a few times, in the chest area, I went
26    for the neck. I then noticed my piece broke, and I flushed it. [Lindsay] called 'man down,'
    and then the K9's arrived."

27

28         Both Lindsay and Teso testified that huilas are used to communicate within the
    gang and are carried by designated couriers from place to place. Huilas are written on

6

very small pieces of paper to avoid detection, and writing a huila is a skill learned by gang members.

Obviously a damaging piece of evidence, the admission of the huila was litigated heavily at trial. On appeal, the defendants raise three related issues: (1) was the huila properly authenticated; (2) was it properly admitted under Evidence Code section 352; and (3) did its admission violate the rule of *Aranda/Bruton*.[FN3]

FN3. *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

*A. Authentication*

Evidence Code section 1401 requires that a document be authenticated before it is admitted into evidence. The defendants claim that the trial court erred when it admitted the huila after finding that it had been authenticated pursuant to Evidence Code section 1421. This section provides that a writing may be authenticated by evidence that the writing refers to or states matters unlikely to be known by anyone other than the claimed author. The trial court found that only A. Lopez would have known the exact date of his arrival at the Stanislaus County Jail. The defendants claim this finding cannot withstand scrutiny because Lindsay also remembered the date of A. Lopez's arrival, many months later, and that there were 11 men in the cell who would have known the details of the assault.

On appeal, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718; *People v. Williams* (1997) 16 Cal .4th 153, 197.) We find error only where the trial court's decision exceeds the bounds of reason. (*People v. Funes* (1994) 23 Cal.App .4th 1506, 1519.) In addition, we review the trial court's ruling, *not* its reasoning. (*People v. Mason* (1991) 52 Cal.3d 909, 944.)

There are innumerable ways in which a document may be authenticated. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372; *People v. Gibson* (2001) 90 Cal.App.4th 371, 383; *McAllister v. George* (1977) 73 Cal.App.3d 258, 263.) Evidence Code section 1410 provides that, "[n]othing in this article shall be construed to limit the means by which a writing may be authenticated or proved." "Circumstantial evidence, content and location are all valid means of authentication. [Citations.]" (*People v. Gibson, supra,* at p. 383; see also *People v. Olguin, supra,* at p. 1372 [both content and location identified papers as work of defendant].) Here, the huila was found on one of the cellmates the day after the assault. It described the assault in detail and is consistent with the evidence at trial. There was evidence that huilas are used to communicate with gang members in other locations in the jail and outside the jail about gang activity. Teso testified that, because Lindsay was a gang member with some status, the attack had to be justified to gang leaders. The manner of the writing, small print on a small piece of paper, is consistent with the description of huilas given by Lindsay and Teso. The huila was signed by "Soldier," a moniker for A. Lopez. In combination, there is ample circumstantial and direct evidence that the huila is what the prosecution purports it to be: a gang communiqué, written by A. Lopez, reporting the assault on Lindsay. (See *People v. Olguin, supra,* 31 Cal.App.4th at p. 1372 [lyrics handwritten on yellow paper properly authenticated as being written by defendant where they refer to author by defendant's gang moniker or by nickname easily derived from defendant's proper name, include references to Southside gang membership, and could be interpreted as referring to disk-jockeying, a part-time employment of defendant].)

The other objections to the contents of the huila go to its weight, not to

1    admissibility. There was a reference to "Lil Man" in the body of the huila, which might
2    suggest the "Manos" the huila was addressed to was not Lucero. It seems improbable,
     however, that A. Lopez would write a huila to Lucero telling him that he (Lucero)
3    participated in the assault. Or, if the purpose of the huila was not to inform, but to
     memorialize, it also is improbable that A. Lopez would use two different monikers to
4    refer to the same person. The record is clear that Lucero is usually referred to as "Lil
     Man." The jurors, however, did not see or hear this reference, and any question they
5    might have had about why A. Lopez was writing to Lucero was resolved against Lucero.

6    (See Resp't's Lodged Doc. 1.)

7        Respondent correctly argues that Petitioner's claim is meritless as Petitioner fails to

8    allege a violation of clearly established Supreme Court precedent in support of his claim.

9        Under AEDPA, even clearly erroneous admissions of evidence that render a trial
         fundamentally unfair may not permit the grant of federal habeas corpus relief if not
10       forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28
         U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a
11       claim, this court cannot use its own precedent to find a state court ruling unreasonable.
         [Carey v. Musladin, 549 U.S. 70, 77 (2006)].

12       The Supreme Court has made very few rulings regarding the admission of
         evidence as a violation of due process. Although the Court has been clear that a writ
13       should be issued when constitutional errors have rendered the trial fundamentally unfair,
         [see Williams v. Taylor, 529 U.S. 362, 375 (2000)], it has not yet made a clear ruling that
14       admission of irrelevant or overtly prejudicial evidence constitutes a due process violation
         sufficient to warrant issuance of the writ. Absent such "clearly established Federal law,"
15       we cannot conclude that the state court's ruling was an "unreasonable application." [Carey
         v. Musladin, 549 U.S. 70, 77 (2006)]. Under the strict standards of AEDPA, we are
16       therefore without power to issue the writ on the basis of [Petitioner's] additional claims.

17   Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009).

18       In this case, Petitioner fails to allege the violation of any clearly established Supreme

19   Court authority for the admission of improperly authenticated evidence in violation of his federal

20   constitutional rights.  Therefore, the claim must be rejected. See 28 U.S.C. § 2254(d).

21       Even if could demonstrate the violation of clearly established Supreme Court precedent,

22   he would not be entitled to habeas relief.  In evaluating an alleged error by the trial court, the

23   question is whether the error had a "substantial and injurious effect or influence in determining

24   the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 636-638 (1993); see also Fry v. Pliler,

25   551 U.S. 112, 121-22 (2007) (in § 2254 proceedings, the prejudicial impact of constitutional

26   error in a state-court trial must be assessed under the Brecht standard).  In this case, as

27   Respondent notes, the trial court advised the jury to disregard the "huila" as to Petitioner and to

28   consider it only as it pertained to codefendant Lopez.  Jurors are presumed to follow their

1  instructions.  Greer v. Miller, 483 U.S. 756, 766, n.8 (1987).  Thus, the admission of the "huila"

2  could not have had a substantial or injurious effect in determining the jury's verdict as to

3  Petitioner.

4       B.   Admission of "huila" in Violation of Confrontation Clause

5       Petitioner next claims the admission of the "huila" violated his rights under the

6  Confrontation Clause of the Sixth Amendment under Bruton v. United States, 391 U.S. 123

7  (1998).  This claim was also presented on direct appeal where it was rejected.  The appellate

8  court issued the last reasoned decision, as follows:

> Finally, with respect to the huila, P. Lopez and Lucero also challenge its admission on *Aranda-Bruton* grounds, arguing that their Sixth Amendment right to cross-examine the author of the huila was violated. Under the *Aranda-Bruton* rule, it is error in a joint criminal trial to admit an admission by a nontestifying codefendant that incriminates another codefendant, even if the jury is instructed not to consider the hearsay as evidence against the other codefendant. (*Aranda, supra,* 63 Cal.2d at pp. 528-530; *Bruton, supra,* 391 U.S. at p. 126.) The rule is motivated by the concern that incriminating a defendant by a nontestifying codefendant's hearsay violates the defendant's rights under the confrontation clause of the Sixth Amendment to confront and cross-examine his accusers. (*Bruton, supra,* at pp. 126, 136; *People v. Fletcher* (1996) 13 Cal.4th 451, 455, 465 (*Fletcher*).) The rule applies even where the hearsay statement has been redacted or sanitized to replace the nondeclarant defendant's name with a blank space, the word "delete," or some unique symbol. (*Gray v. Maryland* (1998) 523 U.S. 185, 188, 194-195 (*Gray*); *Fletcher, supra,* at p. 455.)

> On the other hand, the rule has been held not to require exclusion of evidence (or separate trials) where the codefendant's confession is redacted to eliminate any indication that there was another perpetrator. Under these circumstances, the confession can be admitted in a joint trial with a limiting instruction. (*Richardson v. Marsh* (1987) 481 U.S. 200, 203, 211 (*Richardson*); *Fletcher, supra,* 13 Cal.4th at p. 455 [issue is whether reference is "facially incriminating" of nondeclarant defendant].) In an attempt to avoid *Aranda-Bruton* issues, the trial court ordered that the huila's reference to three "bombers," "Lil Man, Mugsy and Scorpion" (Lucero, P. Lopez and McKenzie), be redacted. The jury was given a limiting instruction telling them that it was not to consider the huila against any defendant other than A. Lopez.

> The defendants recognize that the rule in *Bruton* has been restricted by *Richardson* and *Fletcher* and argue that, despite the redaction, the huila as read to the jurors falls within the protection of *Aranda-Bruton* because it includes the statement that the author "assisted" in the assault. According to defendants, this reference implies that others participated in the assault and runs afoul of the rules for admission described in *Richardson* and *Fletcher.* We disagree.

> In *Richardson,* the United States Supreme Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Richardson, supra,* 481 U.S. at p. 211, fn. omitted.) The court distinguished the redacted confession before it from the confession at issue in *Bruton,* because the redacted confession was not

9

incriminating on its face, but became so only when linked to other evidence. (*Richardson, supra,* at p. 208.) In *Gray,* the Supreme Court considered a confession that was redacted to replace the defendant's name with an obvious indication of deletion, such as the word "deleted" or a symbol. (*Gray, supra,* 523 U.S. at p. 192.) The court determined that this type of case turned not on whether an inference was required to incriminate the defendant, but on the type of inference required. If the confession made a direct reference to a perpetrator other than the speaker and the jury immediately could infer, *without considering other evidence,* that that perpetrator was the defendant, then admission of the confession was *Bruton* error despite a limiting instruction. (*Gray, supra,* at p. 196.)

In *Fletcher,* the California Supreme Court considered whether "it is sufficient, to avoid violation of the confrontation clause, that a nontestifying codefendant's extrajudicial confession is edited by replacing all references to the nondeclarant's name with pronouns or similar neutral and nonidentifying terms." It recognized that "[s]uch a confession is 'facially incriminating' in the sense that it is sufficient by itself, without reference to any other evidence, to incriminate someone other than the confessing codefendant. It is not 'facially incriminating' only in the sense that it does not identify this other person by name." (*Fletcher, supra,* 13 Cal.4th at p. 456.) The court concluded:

"[W]hether this kind of editing-which retains references to a coparticipant in the crime but removes references to the coparticipant's name-sufficiently protects a nondeclarant defendant's constitutional right of confrontation may not be resolved by a 'bright line' rule of either universal admission or universal exclusion. Rather, the efficacy of this form of editing must be determined on a case-by-case basis in light of the other evidence that has been or is likely to be presented at the trial. The editing will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun." (*Fletcher, supra,* 13 Cal.4th at p. 456.)

In this case, we conclude that the editing complies with the rule set forth in *Richardson, Gray,* and *Fletcher.* With respect to P. Lopez, there is no reference in the huila that could support an inference that he assisted in the assault absent consideration of independent trial evidence. There were 11 men in the cell other than Lindsay who could have assisted in the assault, and nothing in the huila links those assisting to P. Lopez. We are not persuaded by the argument that the jury could easily infer the identities of those who "assisted" Soldier in the assault from Lindsay's testimony that it was only when the prosecutor told him the four defendants would be prosecuted that Lindsay would identify his assailants. The *Aranda-Bruton* rule does not extend to those situations in which independent evidence reveals either directly or indirectly who is implicated by a codefendant's confession. As the court in *Gray* stated, it is only when the jury can immediately infer, *without considering other evidence,* that that perpetrator was a defendant, that the admission of the confession violated *Aranda- Bruton.* (*Gray, supra,* 523 U.S. at p. 196.)

The issue is more complicated with respect to Lucero. The huila was written to "Manos." There was testimony at trial that Lucero, in addition to being known as "Lil Man," was also known as "Manos," even though as we have pointed out the internal reference to "Lil Man" makes it less likely the "Manos" of the huila and the "Manos" of the cell are the same person. As a result, the editing did not eliminate all reference to Lucero. We conclude that the reference to "Manos" is not facially incriminating in relation to the assault. Given the context of the reference, e.g., the naming of the person to whom the huila is written, it is unlikely the jury would have concluded that "Manos" was one who "assisted" in the assault in the absence of independent trial evidence.

The reference, however, is incriminating in relation to the gang-participation

count, because it established "Manos," whom the jury understood to be Lucero, as a gang member of status, to whom other gang members would report. Although a close call, we believe, under *Aranda-Bruton,* the huila should not have come in as to Lucero.

  *Aranda-Bruton* error is not reversible per se, but does implicate a constitutional right and is therefore subject to review under the harmless-beyond-a-reasonable-doubt standard of *Chapman v.. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Song* (2004) 124 Cal.App.4th 973, 981; *People v. Anderson* (1987) 43 Cal.3d 1104, 1128.) There was a significant amount of independent evidence that A. Lopez, Lucero, and P. Lopez assaulted Lindsay. The jury obviously found Lindsay to be believable; it convicted the three defendants on direct testimony from Lindsay that they hit or kicked him, but acquitted McKenzie on Lindsay's testimony that he did not see McKenzie participate in the attack. There was also independent evidence of serious injury, verification of physical injuries consistent with Lindsay's account, independent evidence of opportunity and motive, as well as other evidence of guilt. Although the defense tends to discount Lindsay's version of events, he obviously did not fake his attack. Having reviewed the entire record, we conclude that the admission of the huila, even if found to violate the defendants' constitutional rights, was harmless beyond a reasonable doubt.

(See Resp't's Lodged Doc. 1.)

  The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. am. VI.  The Sixth Amendment's Confrontation Clause was made applicable to the states through the Due Process Clause of the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400, 403-05 (1965). The Supreme Court has stated that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. 123, 135 (1968).  Such a situation is presented where

  the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others.  The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

Id. at 135-36.

  However, Bruton's scope was limited by Richardson v. Marsh, 481 U.S. 200, 211 (1987), in which the Supreme Court held that the admission of a non-testifying co-defendant's confession

1   does not violate the Confrontation Clause when a proper limiting instruction is given and "the

2   confession [is] not incriminating on its face [but becomes] so only when linked with evidence

3   introduced later at trial." In Richardson, the Court held that admission of a non-testifying co-

4   defendant's confession did not violate the defendant's right under Confrontation Clause where the

5   court instructed the jury not to use the confession in any way against the defendant, and the

6   confession was redacted to eliminate not only the defendant's name, but any reference to his

7   existence. Id. at 211.

8       In this case, the state court rejection of Petitioner's claim was not contrary to or an

9   unreasonable application of Supreme Court precedent.  The statement by the codefendant in this

10  case did not "expressly implicate" Petitioner.  Id. at 208, *citing* Bruton, 391 U.S. at 124, n.1. The

11  statement on its face did not incriminate Petitioner; it only became inculpatory when other

12  evidence was introduced at trial. Id. As pointed out by the appellate court, there were eleven men

13  in the cell who could have assisted Petitioner's codefendant in the assault.  Nothing in the

14  statement linked Petitioner with those who assisted.  Therefore, the state court determination that

15  this case fell within the scope of Richardson was not unreasonable.

16      Even if admission of the statement violated Petitioner's due process rights under the

17  confrontation clause, the admission could not have had a substantial and injurious effect on the

18  jury's determination of the verdict. Brecht, 507 U.S. at 636-638.  There was overwhelming

19  evidence of Petitioner's guilt including the testimony of the victim, the evidence of injuries

20  suffered by the victim, the evidence of motive and opportunity, the physical evidence of injuries

21  sustained by Petitioner consistent with the victim's account, and other evidence.  Therefore, the

22  claim must be denied.

23      C.   Prosecutor's Failure to Disclose Evidence and Coaching of Witness

24      In his final claim for relief, Petitioner alleges his constitutional rights were violated when

25  the prosecutor failed to disclose evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963).

26  He also alleges the key witness in the case was coached by a deputy.

27      Petitioner's Brady claim was not presented to the state courts.  It is therefore unexhausted.

28  28 U.S.C. § 2254(b)(1).  Nevertheless, the claim may be denied on the merits notwithstanding

1   the failure to exhaust. 28 U.S.C. § 2254(b)(2).  As noted by Respondent, to make out a <u>Brady</u>

2   claim, Petitioner must demonstrate that "[t]he evidence at issue must be favorable to the accused,

3   either because it is exculpatory, or because it is impeaching; that evidence must have been

4   suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

5   <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  In this case, Petitioner has made no such

6   showing. He has not identified any evidence that was withheld by the prosecution; he has not

7   shown how that evidence was exculpatory or impeaching; he has not shown it was in fact

8   suppressed; and he has not demonstrated prejudice.  The claim is unfounded and must be denied.

9       Petitioner's allegation that a witness was coached was presented on direct appeal and

10   denied on the merits.  The appellate court issued the last reasoned decision, as follows:

11   The defendants contend that they were denied due process and a fair trial because Lindsay was coached by Deputy Teso to change his trial testimony. Teso escorted Lindsay to trial each day and therefore had an opportunity to speak with him outside of the courtroom. In addition, Teso was the designated investigator and the gang expert for the prosecution so he was aware of the legal issues and proof needed in the prosecution case. On May 7, 2007, Lindsay testified that A. Lopez had come to the Stanislaus County Jail from state prison a "week before" October 19, 2006. The next day, on May 8, 2007, Lindsay testified that A. Lopez came from state prison, "probably" 10 days before the 19th, "maybe the 9th, 8th, something of that week." The jail records established that A. Lopez arrived at the jail on October 12, exactly seven days prior to the 19th.

In admitting the huila, the trial court found the statement have it that A. Lopez had arrived on October 12 was information only A. Lopez would have in his possession. The defendants argue that Lindsay's initial testimony that A. Lopez came to the jail the week before October 19 equates to testimony that A. Lopez arrived at the jail precisely on October 12 and therefore undercuts the trial court's finding with respect to the huila. The defendants also argue that Lindsay's change of testimony on this key point supports an inference that Lindsay changed his testimony after being coached by Teso.[FN5] We disagree.

FN5. At trial the bulk of the argument presented on this issue related to the prosecution gaining additional discovery from the conversations between Teso and Lindsay. The defense asked that a different security escort be assigned. When the court refused to do so, the defense asked that all conversations between Teso and Lindsay be taped. The court denied the request but did order that if any new evidence was discovered, the prosecution was to provide it immediately to the defense. During cross-examination, the defense focused on the same issue. Lindsay was asked whether he told Teso things about gang life. Lindsay said he and Teso talked about lots of different things, but not about gang life. Lindsay said they talked mainly about his feelings and his fear of testifying. Teso also testified that he and Lindsay talked to each other during the transport, but not about gangs or gang involvement. Despite an opportunity to do so, the defense failed to cross-examine either Teso or Lindsay about whether they discussed Lindsay's change in testimony concerning the date A. Lopez arrived at the jail.

We have already concluded that, notwithstanding the trial court's reasoning, the huila was properly authenticated. Second, we are not certain Lindsay's initial statement that A. Lopez came to the jail the week before October 19 must be read to mean he arrived on an exact date: October 12. The term "one week ago" does not always mean a specific calendar date exactly seven days prior but instead establishes a time frame. Although Lindsay's later testimony appears to expand the time frame to 10 days, the change is not significant enough to undercut the trial court's finding regarding the admission of the huila.

Even if we were to conclude that Lindsay actually changed his testimony to assist the prosecution, there is nothing in the record to suggest that Teso coached Lindsay to do so. There are many possibilities to explain the slight change in Lindsay's testimony. For example, he may simply have misremembered the time frame differently. Upon being questioned by the prosecution a second time, Lindsay might have been less confident in his earlier recollection. Further, Lindsay, who had transcripts and records in his possession, might have reached his own conclusion about the impact his prior testimony had on the prosecution and decided to change it to benefit the prosecutor's case. Any of these reasons are just as plausible as concluding that Teso coached Lindsay. (See *People v. Gray* (2005) 37 Cal.4th 168, 230; *In re Avena* (1996) 12 Cal.4th 694, 738; *People v. Williams* (1988) 44 Cal.3d 883, 933.)

(See Resp't's Lodged Doc. 1.)

Respondent argues the claim is without merit since Petitioner fails to demonstrate that Deputy Teso coached Lindsay. The Court agrees. There is nothing in the record that would indicate Teso persuaded Lindsay to change his testimony or that Lindsay did change his testimony to suit the prosecution. Lindsay appeared to alter his recollection of when A. Lopez had arrived at the Stanislaus County Jail from a "week before" to "probably" 10 days before the 19th, "maybe the 9th, 8th, something of that week." (See Resp't's Lodged Doc. 1.) Nevertheless, as found by the state court, this change in testimony does not prove Lindsay was coached. The phrase "a week ago" does not always mean exactly seven days; it is often used to reference a general time frame of approximately seven days. In addition, Lindsay had transcripts and records in his possession. He could easily have used them for reference in modifying his testimony. The minor change in Lindsay's recollection of the time frame simply does not show Lindsay was coached. Moreover, defense counsel was free to address Lindsay's credibility on cross-examination or closing argument and in fact did so. See Geders v. United States, 425 U.S. 80, 89-90 (1976) ("opposing counsel in the adversary system is not without weapons to cope with 'coached' witnesses"); United States v. Sayakhom, 186 F.3d 928, 945 (9th Cir.1999) ("[c]ross-examination and argument are the primary tools for addressing improper witness coaching").

14

1    Finally, even if coaching occurred, Petitioner has not demonstrated how such coaching made his

2    trial fundamentally unfair.  Sayakhom, 185 F.3d at 945.

3

4        Petitioner fails to demonstrate that the state court's decision was contrary to, or involved

5    an unreasonable application of, clearly established Federal law.  28 U.S.C. § 2254(d)(1).  The

6    claim must be denied.

7    IV.    Certificate of Appealability

8        A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

9    district court's denial of his petition, and an appeal is only allowed in certain circumstances.

10   Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

11   whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

12           (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
             district judge, the final order shall be subject to review, on appeal, by the court
13           of appeals for the circuit in which the proceeding is held.

14           (b) There shall be no right of appeal from a final order in a proceeding to test the
             validity of a warrant to remove to another district or place for commitment or trial
15           a person charged with a criminal offense against the United States, or to test the
             validity of such person's detention pending removal proceedings.
16
             (a)    (1) Unless a circuit justice or judge issues a certificate of appealability, an
17                  appeal may not be taken to the court of appeals from–

18                      (A) the final order in a habeas corpus proceeding in which the
                        detention complained of arises out of process issued by a State
19                      court; or

20                      (B) the final order in a proceeding under section 2255.

21           (2) A certificate of appealability may issue under paragraph (1) only if the
             applicant has made a substantial showing of the denial of a constitutional right.
22
             (3) The certificate of appealability under paragraph (1) shall indicate which
23           specific issue or issues satisfy the showing required by paragraph (2).

24       If a court denies a petitioner's petition, the court may only issue a certificate of

25   appealability "if jurists of reason could disagree with the district court's resolution of his

26   constitutional claims or that jurists could conclude the issues presented are adequate to deserve

27   encouragement to proceed further."  Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473,

28   484 (2000).  While the petitioner is not required to prove the merits of his case, he must

demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

### ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.      The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2.      The Clerk of Court is DIRECTED to enter judgment in favor of Respondent; and

3.      The Court DECLINES to issue a certificate of appealability.


IT IS SO ORDERED.

**Dated:**   **December 12, 2010**              _____  **/s/ Gary S. Austin**          
                                        UNITED STATES MAGISTRATE JUDGE

16